## AMERICAN FINE ART CO. v. SIMON.

(Circuit Court of Appeals, Second Circuit.   August 1, 1905.)

### No. 224.

**1. CONTRACTS—CONSTRUCTION—UNILATERAL CONTRACT.**

Plaintiff agreed to prepare certain designs and advertising matter and work for the defendant's exclusive and peculiar use, and defendant in consideration thereof agreed that, "if he approved of said designs on their presentation," such approval should constitute an order for work in quantities and at the price specified therein, unless he should exercise his privilege of decreasing or increasing the quantities at a proportionate decrease or increase of the price, etc.  *Held,* that such contract was unilateral, and could only become obligatory on defendant by the approval of the designs submitted.

**2. SAME—FRAUD.**

Where a written contract was neither ambiguous nor uncertain, and it did not appear that plaintiff made any false representations or induced defendant to execute the contract in any way other than as specified therein, and it appeared that a draft was submitted to defendant's counsel, who inserted additional paragraphs stating defendant's understanding of the contract and the character and extent of the obligations defendant was to assume, a contention that the contract was a fraudulent scheme on the part of plaintiff to induce defendant to obligate himself for large orders was unsustainable.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 420–425.]

**3. FRAUDS, STATUTE OF—CONTRACTS NOT TO BE PERFORMED WITHIN A YEAR.**

Where an oral contract modifying a previous written one providing for the preparation of advertising material conferred on defendant the privilege of dividing deliveries in two annual installments, the work required thereafter to be distributed for the next two years, as defendant might require, it did not disclose that the parties understood that the contract was not to be performed within a year, and was therefore not within the statute of frauds.

**4. CONTRACTS—MODIFICATION—DISCHARGE.**

A contract not performed on either side may be discharged by a subsequent oral agreement changing its terms, whereby a new contract is in effect substituted for the old one.

**5. SAME—RESCISSION—EVIDENCE.**

A written contract required plaintiff to prepare and submit designs for advertising, in consideration of which defendant agreed that, if he approved of the designs on presentation, such approval should constitute an order for work in certain quantities.  On the submission of designs defendant refused to approve the same, whereupon plaintiff entered into an oral independent contract with defendant on a new consideration, whereby it was stipulated that defendant should sign the designs in order that plaintiff might secure a copyright, but that the effect of such signatures should be confined to such object, and would not constitute an order for work.  *Held,* that such oral agreement operated as a rescission or discharge of the original contract, and that the signing of the designs did not obligate defendant to pay for work done in connection therewith under the original contract.

In Error to the Circuit Court of the United States for the Western District of New York.

Writ of error from a judgment of the United States Circuit Court for the Western District of New York, entered on a verdict of a jury in favor of the defendant.

140 F.—34

W. H. Hotchkiss and Theodore Kronshage, for plaintiff in error.
Adelbert Moot, for defendant in error.

Before WALLACE, TOWNSEND, and COXE, Circuit Judges.

TOWNSEND, Circuit Judge. The complainant is a Missouri corporation engaged in the general art and lithographing business, and especially that branch thereof which relates to originating, designing, and executing advertising matter for the trade. The defendant is a resident of Buffalo, N. Y., where he has conducted a brewery since 1888. Prior to May 24, 1900, plaintiff had submitted to the defendant certain preliminary designs for advertising the defendant's business, and on said day the parties executed a contract, the material parts of which are as follows:

"Buffalo, New York, May 24th, 1900.

"Mr William Simon, Buffalo, New York. Dear Sir: We will at once complete and forward to the Washington authorities, application for your amended 'Simon-Pure' and other trade-mark matters, and will forward to you at an early date for your approval and signature further applications for trade-mark registrations on the revised label trade-mark and brand for your Malt Extract matters.

"The actual cost connected with the above work to you will be the actual government fee of $25, which must accompany each trade-mark application when sent to Washington.

"On such other work as is developed hereunder, on which we or our artists may obtain copyrights, we will cause, upon your approval and thus ordering work, transfer of the respective copyright to be made to you upon your request and your paying the actual government copyright fee of $1 per copyright.

"We will at once develop and submit to you in finished form for your approval, corrected, finished designs. * * * [Here follow descriptions of designs, etc.]

"These preliminary sketches and designs to be made as herein referred to are to be submitted by us to you with the distinct understanding that no expense is incurred by you for any preliminary sketches or designs which are not approved of, and thus not adopted by you, and with the further understanding, however, that such designs as are discarded by you, are and do remain our property with all reproduction rights, and are to be treated by you as such, until you have made yourself proprietor of such, by approving and thus ordering work done for you.

"Any suggestions which you may write us on any of your own originations which you may wish developed in the way of sketches, etc., will, of course, be and remain your own property and cannot be considered as coming under our protected originations, catchlines and the like.

"We will also submit for your consideration somewhat later, after the preliminary applications have been attended to, two different subjects for * * * your beer department. * * *

"Corrected and complete text for all wording will be submitted for the purpose of your approval before any work is printed, it being furthermore stipulated that in giving you the prices on the quantities herein stated, the privilege is also reserved to you to divide the deliveries in two annual, about equal installments, and you also reserve the privilege by so advising us in writing at the time of submittal of the finished design to either increase any of the respective quantities at the proportionately lower price, or to decrease the quantity at the proportionately higher price, you getting, in this latter case, the full benefit of actual savings obtained by us in such instances by reason of such reductions.

"After the preliminary work has been passed upon by you as satisfactory, we will, as fast as we can conveniently develop and get well in hand the vari-

ous issues and work, push through such part of the various work herein proposed as you may especially request of us in writing, ahead of the balance as preliminary deliveries, with a view of obtaining by simultaneous action the full cumulative effect of a vigorous and well-planned, methodical campaign.

"Upon your approval, and thus ordering the herein referred to respective work, we will lithograph for the beer department the stationary, * * * and such other work and subjects as are approved of by you hereunder when finished designs are submitted, furnishing you for your beer department, delivering if desired and we are so advised, small preliminary lots as soon as ready, in the course of two years as specified, or in changed quantities if we are so advised by you in writing when finished designs are submitted. * * *

"The prices for above work in quantities stipulated subject to your privilege by so advising us in writing at the time of submittal of finished designs to either increase or decrease, as above specified, are as follows: * * *

"In case of your election and so advising us as stipulated, of either decreasing or increasing quantities on any of the above work at time of submittal of finished designs, the prices, as stated, will be rearranged on the basis of your receiving the proportionate benefit and cheapening of cost in larger quantities, while smaller lots cost proportionately more, in which latter case, you are, however, to receive the full benefit of actual savings realized by us in so reducing quantities. * * *

"In case of your election to either increase or decrease the quantities of either of the above work, at the time and in the manner specified, we shall, upon request, furnish you such altered figures of cost of such quantities as you may elect or decide upon, if desired by you, in order to facilitate the consideration or election of such change of quantities, thus enabling matters to be kept free from error.

"The Hanger and Purity allegory on trade-mark will be pushed through first in fine art style, and copyrights will be applied for by us as originators or designers as soon as the work is far enough along, which copyrights will be transferred to you upon your having approved and thus adopted and ordered the respective work as heretofore indicated.

"Such designs as you become the proprietor of by approving of same, or on which we transfer copyright to you, we will, upon request, develop in the form of illustrations without any charge to you in order to enable you to obtain the full cumulative effect of simultaneous publicity efforts.

"No work will be printed by us until finished designs have been approved by you, which approvals or O. K.'s we shall expect from you in writing so as to free us from all responsibility by reason of errors in wording or otherwise, and any changes in, or different arrangements, etc., as may be agreed upon, shall, in order to become binding, bear the signature of both parties, or be made the subject of written acknowledgment by us.

"It is furthermore understood that, by your acceptance of this agreement, no order to execute any work is given by you at this time, excepting for the trade-mark registration matters, and for the different body and neck labels herein referred to, hangers, stationery, envelopes, folders, saloon signs, and booklets, which work is to be pushed through at once, subject to your passing, upon quantity upon submittal of finished designs as per your privileges stipulated herein, and subject, further, to the condition that in case the quantities ordered by you are less than the quantities stated herein as a basis for prices, that then the prices upon the quantities ordered by you shall be mutually agreed upon in writing, and, in case such agreement cannot be made, you will not be required to accept any quantity of such work.

"The quantities and prices herein proposed, as specified by us, are made the basis of our calculations, according to which we can arrange most advantageously for the methodical, cumulatively argumentative, and inferential advertising campaign proposed, and the work required therefor is to be distributed for the next two years as you may order.

"It is, however, understood, that you are not bound to place any future orders with us, but that it is optional with you to approve or not approve finished designs when submitted, and thus to order or not to order, however you

see fit, on conditions herein stipulated, and that such of our suggestions and designs as are not approved by you, cost you nothing, but remain our property absolutely. Terms cash. Prices f. o. b. Milwaukee.

"American Fine Art Company,
                "Alfred von Cotzhausen,  President.

   "Accepted.
        "William Simon."

The parties had previously discussed the terms of the proposed contract, and defendant's counsel had advised him that as originally drawn the cost of its execution would amount to more than $500,000. The defendant struck out certain portions, and his counsel drafted additional paragraphs by way of amendment, which were inserted in the contract as signed, and which are the three last ones quoted above. The contract was signed and accepted by the defendant, and, afterwards, certain designs, trade-mark applications, and drawings were submitted to him, to which he signed his name. Thereafter, plaintiff shipped to defendant certain labels, as ordered, and, later, a controversy arose between the parties as to their respective rights and obligations, in the course of which defendant, on July 26th, ordered some letterheads, billheads, etc. The plaintiff duly filled this latter order, and both of said orders were paid for. On October 21, 1901, plaintiff shipped to defendant work amounting to over $20,000, and, on November 6, 1901, defendant wrote saying that he had never given any order, except that of July 26th, and that he would refuse to receive the other consignments.

Thereafter, this action was brought alleging the execution by defendant of said contract, the promise of defendant to pay for such designs as were approved by him in the quantities specified in said contract; that the defendant had duly approved thereof, but had failed to exercise the option reserved in said contract of decreasing or increasing the quantities therein specified; the plaintiff's performance of his undertakings in said contract; the refusal of defendant to comply with his agreement to execute the necessary papers to secure copyrights, etc., and claiming damages in the sum of $22,000, by reason of defendant's refusal to accept the work delivered to him, and further damages, by reason of defendant's refusal to carry out the contract and his repudiation thereof, for some $232,000, the difference between the contract price on the remainder of the articles named in said contract and the cost to complete and deliver the same.

The defendant in his answer admitted his acceptance of the proposition of May 24, 1900; alleged that his signatures to said pictures and approval thereof were only for the purpose of trade-mark and copyright registration; and that the plaintiff stated to the defendant at the time of the presentation thereof for signature that the defendant would incur no other or different liability or expense in connection therewith; that the defendant did not order any of the merchandise completed under said designs, except as aforesaid, and was not indebted to the plaintiff in any way. The answer further alleged as follows:

"And the defendant further alleges upon information and belief that the plaintiff did not make the proposition aforesaid to this defendant, or procure

this defendant's acceptance thereof, or thereafter do anything in connection therewith, in good faith, with the intent to enter into and perform a valid contract with this defendant; but instead, that the plaintiff in and about all of the matter and things aforesaid, was trying to manufacture what should appear to be evidence of a valid contract and an apparent performance thereof by plaintiff, said plaintiff well knowing, nevertheless, that plaintiff's intent in all said transactions was to create a fictitious claim against this defendant for materials and services claimed to be of large value, that thereby said plaintiff might obtain from this defendant, by extravagant and exaggerated demands, or by negotiations and compromise, or by suit or otherwise, a large sum of money, without returning to this defendant therefor either materials or services of any real value."

Upon the trial the court admitted evidence of certain conversations, which it was claimed modified and detracted from the legal force of said contract; evidence that the defendant did not understand the nature and effect of said contract; evidence that the plaintiff had, during the seven years preceding the trial of this cause, procured from other traders and manufacturers other similar contracts based upon independent transactions with them; certain alleged copies of letters written by plaintiff to former employés in regard to said transactions; and evidence as to the manner in which other lithographic concerns solicited orders and as to lawsuits which the plaintiff had had in the past with other parties unconnected with this defendant or this transaction. Some of this evidence appears to have been admitted upon the theory, as stated by the court, that "the earlier provisions prepared by the plaintiff are in direct conflict with the provisions toward the end" thereof, and that while the earlier provisions were sufficiently broad to create a liability on defendant's part to take the work in the quantities therein specified upon approval of designs, etc., the later provisions conferred upon the defendant the right to refuse any of the designs offered and to impose upon his approval any condition he saw fit, and that, in view of this conflict, oral evidence was admissible to show what conditions were imposed, and the intent of the parties at the time of the approval of the designs subsequent to the signing of the contract. The admission of the evidence in regard to other transactions was predicated upon the theory that the plaintiff secured the execution of a contract, as the court puts it, whose—

"Sole object was to create a fictitious claim which would have the semblance of honesty, for the express purpose of putting the defendant in a position where, from a legal standpoint, it would be policy for him to compromise any claim or demand which the plaintiff might urge against him not exceeding the amount demanded in the complaint."

And the court instructed the jury that from this evidence of other remote and independent transactions and letters they might infer that the plaintiff intended to defeat and defraud the defendant.

An examination of said contract shows that the learned court below was in error in holding that there was a direct conflict between the earlier paragraphs of the contract and those inserted by counsel for defendant. The written contract provided for mutual obligations. It imposed an absolute obligation upon the plaintiff. He was bound thereby to prepare certain designs and work for the exclusive and peculiar use of the defendant, intended to embody certain peculiar

features for his benefit, and the defendant, in consideration thereof, agreed that if he approved of said designs upon their presentation, that such approval should constitute an order for work in the quantities and at the prices specified therein, unless he,. the defendant, should exercise his privilege of decreasing or increasing said quantities at a proportionate decrease or increase of price by advising plaintiff in writing at the time when such finished designs were submitted. This agreement is merely emphasized and explained by the clause in the paragraphs inserted by defendant's attorney that no orders were given by the execution of the contract itself, but that orders for work when given were to be "subject to your passing upon quantity upon submittal of finished designs as per your privileges stipulated herein." The correct construction of the whole contract is fairly summarized in the closing paragraph of the contract, which is here repeated for convenience of reference:

"It is, however, understood that you are not bound to place any future orders with us, but that it is optional with you to approve or not approve finished designs when submitted, and thus to order or not to order, however you see fit, on conditions herein stipulated, and that such of our suggestions and designs as are not approved by you, cost you nothing, but remain our property absolutely."

Defendant, on his part, merely contracted to make a contract if he should thereafter see fit to do so. So far as he was concerned, there was no enforceable existing contract. The occurrence in future of an uncertain event after the signing of the written contract was a condition precedent to the giving of any order. The contract provided that even if he approved a design, he was at liberty to decrease the amount specified in the contract, and that, if the parties failed to agree as to price, he was not bound to take any work of that design. There was, therefore, originally merely a unilateral contract, binding only upon the plaintiff, and there was no ambiguity or uncertainty as to its provisions. The plaintiff, after receiving signatures, treated them as orders, performed its undertakings under said contract, and delivered goods manufactured by it to defendant, and claims damages for defendant's failure to pay therefor, and for his refusal to carry out the remainder of the contract, and for his repudiation of liability thereunder. The defendant denied that he had made any contract, except for such goods as he had specifically ordered on two occasions, and alleged that he had paid the full value thereof, and that his signatures were affixed to the designs for copyright purposes only.

The case thus presented a simple question of the construction of said contract and whether the defendant did or did not so accept and approve the designs, etc., that such acceptance and approval constituted orders according to the terms and conditions of said contract, with or without modification, and the further question as to whether, if defendant did not thus give orders for work, the parties entered into any other agreement which operated as a rescission or discharge of the original agreement. This question was one to be determined by the intention of the parties as manifested by their acts. Munroe v. Perkins, 9 Pick. 298, 20 Am. Dec. 475; Stewart v. Keteltas,

36 N. Y. 388; Cooke v. Murphy, 70 Ill. 96; Moore v. Detroit Locomotive Works, 14 Mich. 266.

But the case was tried in the court below and has been argued here as though the whole question of liability turned upon proof of fraud. We are unable to see how any question of fraud in this or other transactions has any bearing upon the issues herein. While the phraseology of the contract might be suggestive of a purpose on the part of the plaintiff to induce the defendant to obligate himself for large orders, as a consequence of the approval of designs evidenced by his signature, there is nothing therein which justifies any charge of fraud. So far as the issue herein is concerned, as already stated, it was a contract which merely provided that the approval and adoption by the defendant of designs submitted should constitute orders for the work therein specified, in the quantities and at the prices named, unless the defendant should elect to make changes therein at the time of giving the orders. If the defendant, in pursuance of said contract, thus gave such orders, he was liable thereunder. The claim that the plaintiff intended to entrap and defraud the defendant is entirely immaterial. It does not appear that the plaintiff made any false representations or in any way, other than as specified in the contract, induced the defendant to execute the same. Furthermore, if there might have been any possibility of misunderstanding on the part of the defendant, the plaintiff is not chargeable therewith, because he submitted the draft of the proposed contract to counsel for defendant, who inserted additional paragraphs, in which he stated his understanding of the contract and the character and extent of the obligations to be assumed by defendant, and as defendant's counsel says:

"To guard and protect Mr. Simon against any claim of having to take the work in the quantities that were specified there, or to take any part of it that he did not want to take, I drafted some additional paragraphs."

The evidence offered on the part of defendant as to conversations and statements made by the parties at the time when the designs were signed, tended to show that after the signing of said contract, the enforcement of which was conditioned upon the future execution of orders by the defendant, to be evidenced by his signature to designs, as foresaid, the defendant declined to execute any orders, and that the parties agreed that if defendant would merely sign said designs, such signatures should operate, not as orders, as provided for in said contract, but solely as approvals, by virtue of which the plaintiff was to secure copyright and trade-mark registry.

Counsel for plaintiff asserts the extraordinary proposition that where parties have entered into a written contract, whereby one of the parties acquires a right to secure certain privileges upon certain conditions to be thereafter fulfilled at his option, the parties cannot orally agree, before the fulfillment of said conditions, to abandon said contract, and to make a new and independent one upon different terms. In Swain v. Seamens, 9 Wall. 254, 271, 19 L. Ed. 554, the Supreme Court says:

"Numerous authorities sanction the principle advanced by the complainants in cases not within the statute of frauds, and which fall within the general

rules of the common law; and in such cases it is held that the parties to an agreement, though it is in writing, may, at any time before the breach of it, by a new contract not in writing, modify, waive, dissolve, or annul the former agreement, if no part of it was within the statute of frauds."

The evidence of defendant as to what occurred at the time of signing said designs presented no question as to prior or contemporaneous conversations to contradict or vary a valid written contract. If the jury believed this evidence, the subsequent oral contract was the only one under which the defendant incurred any obligation. Nor would the provisions of the statute of frauds or the rules applicable to contracts under seal have any bearing upon the issue. The cases cited upon these points merely illustrate the well-settled rules as to oral contradictions or modifications of the provisions of an absolute and completed contract, and the distinction to be applied between those cases where the issue is between the parties to the contract and those where the rights of an innocent third party have intervened. Burke v. Dulaney, 153 U. S. 228, 239, 14 Sup. Ct. 816, 38 L. Ed. 698. Here, the issue is between the parties to the written contract and it was not under seal. It is not within the statute of frauds, because it contained no present agreement not to be performed within a year, but merely provided for a future option upon a future contingency. Furthermore, the contract was not within the statute of frauds because the provisions, "the privilege is also reserved to you to divide the deliveries in two annual about equal installments, * * * and the work required thereafter is to be distributed for the next two years as you may order," do not apply to agreements not to be performed within the year, but to agreements which merely may not be performed within that period. In order that an oral contract may be held void under this branch of the statute, it must appear that it was the understanding of the parties that it was not to be performed within the year. McPherson v. Cox, 96 U. S. 404, 24 L. Ed. 746, and cases cited. If the agreement may, consistently with its terms, be entirely performed within the year, it is not within the condemnation of the statute. Kent v. Kent, 62 N. Y. 560, 20 Am. Rep. 502.

Here, the contract merely gave an option to the defendant, provided he should elect to give the orders, to divide the deliveries in two annual installments, or have the work distributed during the two years as he might order. It is well settled that a contract not performed on either side may be discharged by agreement of the parties, and that this discharge may be effected by a change in the terms whereby a new contract is in effect substituted for the old one. Such a contract may be discharged by an oral agreement. Benjamin on Contracts, 113, 114, and cases cited; Rollins v. Marsh, 128 Mass. 116; Rogers v. Rogers & Brother, 139 Mass. 440, 1 N. E. 122; McCreery v. Day, 119 N. Y. 1, 23 N. E. 198, 6 L. R. A. 503, 16 Am. St. Rep. 793. In Teal v. Bilby, 123 U. S. 572, 578, 8 Sup. Ct. 239, 31 L. Ed. 263, the Supreme Court says:

"It is hardly pretended by counsel for plaintiffs that it was not competent, after the written contract was made and signed by the parties, for them to make another verbal contract in regard to some parts of it, which to that extent should be a substitute for the first one. There is nothing in the nature

of the contract itself requiring it to be in writing, nor is there any principle making it necessary that the new one should be reduced to writing because the first was written. 1 Greenleaf on Evidence, § 303; Goss v. Nugent, 5 B. & Ad. 58; Lattimore v. Harsen, 14 Johns. 330; Munroe v. Perkins, 9 Pick. 298, 20 Am. Dec. 475."

There is some conflict of authorities as to whether a contract required by the statute of frauds to be in writing can be discharged when the discharge is not a simple rescission, but is by the substitution of a new oral contract which is inconsistent with the original contract. Clark on Contracts, 621, and cases cited. As the Supreme Court says in Swain v. Seamens, supra:

"Reported cases may also be found where that rule [the rule that a written contract may be varied by subsequent oral agreement] is promulgated without any qualification; but the better opinion is that a written contract falling within the statute of frauds cannot be varied by any subsequent agreement of the parties, unless such new agreement is also in writing."

But the decisions upon this question do not affect the case at bar because, as already shown, the original contract was only a conditional one and not within the statute, and the evidence introduced tended to show that the oral agreement, which it was alleged was substituted therefor, was made before defendant had affixed his signature to the designs submitted and, therefore, before he had incurred any obligation. The principle upon which this evidence was admissible is well illustrated by the following citation:

"This evidence shows that the contract upon which this suit is brought never went into effect, that the condition upon which it was to become operative never occurred, and that it is not a question of contradicting or varying a written instrument by parol testimony, but that it is one of that class of cases well recognized in the law by which an instrument, whether delivered to a third person as an escrow or to the obligee in it, is made to depend, as to its going into operation, upon events to occur or to be ascertained thereafter." Ware v. Allen, 128 U. S. 590, 595, 596, 9 Sup. Ct. 174, 176, 32 L. Ed. 563. Michels v. Olmstead, 157 U. S. 198, 201, 15 Sup. Ct. 580, 39 L. Ed. 671; Hartford Fire Insurance Co. v. Wilson, 187 U. S. 467, 474, 23 Sup. Ct. 189, 47 L. Ed. 261.

The defendant affixed his signature to the contract and to certain designs, and, according to his testimony, delivered said designs to plaintiff for a particular purpose, namely, to enable him to secure copyright thereon, and for no other purpose. It is abundantly established by the authorities that oral evidence is admissible as between the original parties to show that a writing signed by the parties, and which apparently constituted a contract between them, was not intended as a contract, nor understood by either party to be binding as such (Michels v. Olmstead, supra); or that the party to whom an instrument is delivered is attempting to use it for a purpose not contemplated by either party at the time when the delivery was made (Quebec Bank of Toronto v. Hellman, 110 U. S. 178, 182, 4 Sup. Ct. 76, 28 L. Ed. 111; McFarland v. Sikes, 54 Conn. 250, 7 Atl. 408, 1 Am. St. Rep. 111), and to show that an instrument containing an absolute promise to pay, or a promise to pay upon a contingency, was conditionally delivered (Hartford Fire Insurance Co. v. Wilson, supra).

The case of Pym v. Campbell, cited with approval in Ware v. Allen, supra, is strikingly. like the case at bar. There the defendants had signed an agreement to buy an interest in an invention. It appeared, however, from the evidence that the agreement was executed with the understanding that it should not be binding until a certain engineer should approve of the invention. Erle, J., said:

"I am of opinion that the evidence showed that in fact there was never any agreement at all. * * * If it be proved that in fact the paper was signed with the express intention that it should not be an agreement, the other party cannot fix it as an agreement upon those signing. The distinction in point of law is that evidence to vary the terms of an agreement in writing is not admissible, but evidence to show that there is not an agreement at all is admissible."

So, in Burke v. Dulaney, supra, where an action was brought on a promissory note, the court held that it was competent to show an oral agreement between the parties, contemporaneous with the delivery of the note, that it should not become operative until the maker should examine the property and determine whether he would purchase it. Mr. Justice Harlan said:

"According to the evidence so offered and excluded the writing in question never became, as between Burke and Dulaney, the absolute obligation of the former, but was delivered and accepted only as a memorandum of what Burke was to pay in the event of his electing to become interested in the property, and from the time he so elected, or could be deemed to have elected, it was to take effect as his promissory note, payable according to its terms. His election, within a reasonable time, to take such interest was made a condition precedent to his liability to pay the stipulated price. The minds of the parties never met upon any other basis, and a refusal to give effect to their oral agreement would make for them a contract which they did not choose to make for themselves."

To the same effect is McFarland v. Sikes, supra, cited with approval in Burke v. Dulaney. The general rule stated above has been applied to contracts within the statute of frauds on the principle that courts will not permit the statute to be used as an instrument of fraud. Ryan v. Dox, 34 N. Y. 307, 90 Am. Dec. 696; Bork v. Martin, 132 N. Y. 280, 30 N. E. 584, 28 Am. St. Rep. 570.

The liability of defendant, except as to the orders actually given, not here in dispute, depended upon the condition of his thereafter giving orders for work as specified in said contract. The evidence introduced by defendant tended to show that when the performance of said condition, which was expressly left optional with defendant, was requested by plaintiff, defendant refused to perform, as he had a perfect right to do, and that plaintiff acquiesced in said refusal and entered into a new and independent contract with defendant, upon a new consideration, whereby it was agreed that defendant should sign said designs in order that plaintiff might secure copyright, but that the effect of such signature would be confined to said object and would not constitute any order for work. If this were so, the adoption of the new contract, upon the new consideration, effected a rescission or discharge of the original contract by mutual consent.

What has been said sufficiently indicates that the greater part of the testimony for the defendant admitted upon the trial against the

exceptions of the plaintiff was irrelevant, and merely served to inject into the controversy supposititious issues which ought not to have been submitted to the jury. The exceptions of the plaintiff were well taken, and afford good ground for the assignments of error.

The judgment is reversed, and the cause is remanded for a new trial.